**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FRISKIT, INC.,** | **NO. C 03-05085 WWS** |
| Plaintiff, | **ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| **REALNETWORKS, INC., et al.,** | |
| Defendants. | |

Friskit, Inc. filed this action on June 27, 2003, against RealNetworks, Inc., and Listen.com (collectively Real) alleging infringement of three patents. During the course of the litigation, Friskit added two more patents, with the following five patents constituting those in issue:

United States Patent No. 6,389,467 ('467 Patent) (filed May 2, 2000) entitled "Streaming Media Search and Continuous Playback System of Media Resources Located by Multiple Network Addresses";

United States Patent No. 6,484,199 ('199 Patent) (filed Mar. 22, 2002) entitled "Streaming Media Search and Playback System for Continuous Playback of Media Resources Through a Network";

United States Patent No. 6,519,648 ('648 Patent) (filed July 11, 2000) entitled "Streaming Media Search and Playback of Multiple Media Resources Located on a Network";

United States Patent No. 6,725,275 ('275 Patent) (filed Sept. 20, 2002) entitled "Streaming Media Search and Continuous Playback of Multiple Media Resources Located on a Network";

1  United States Patent No. 6,735,628 ('628 Patent) (filed Sept. 20, 2002) entitled
2  "Media Search and Continuous Playback of Multiple Media Resources Distributed on a Network."

3  Friskit is the owner of the above patents. Real is a provider of digital audio and video
4  products and services, including RealOne Player Plus which delivers content subscription
5  services and allows its users, inter alia, to search for streaming media files, create custom
6  playlists, and listen to the streaming media files sequentially and continuously. Listen.com is
7  an online music distribution company that develops and distributes Rhapsody, a digital music
8  subscription service. Rhapsody allows its users, inter alia, to search for streaming media files,
9  create custom playlists, and listen to the streaming media files sequentially and continuously.
10 In August 2003, RealNetworks acquired Listen.com. Friskit alleges that the RealOne Player
11 Plus and subscription service and Listen's Rhapsody service infringe the patents in suit. As
12 described in one of the patents, Friskit's "invention relates to the field of streaming media
13 content search and playback over a network. In particular, the invention relates to a computer
14 system that enables a continuous streaming media playback from a distribution of sites available
15 over a network such as the Internet." '648 Patent col.1 l.21-27.

16 At the court's instance, and without objection, Friskit limited the scope of the litigation
17 to eight claims: patent '467 claims 35 and 52; patent '648 claims 49 and 52; patent '275 claims
18 6, 16, and 38; and patent '628 claim 12. Before the court is defendants' motion for summary
19 judgment for obviousness under 35 U.S.C. § 103. Discovery has been completed and the court
20 has heard oral argument.

21 **I.    LEGAL STANDARDS**

22     A.    Summary Judgment

23 Summary judgment is appropriate "if the pleadings, depositions, answers to
24 interrogatories and admissions on file, together with the affidavits, if any, show that there is no
25 genuine issue as to any material fact and that the moving party is entitled to judgment as a
26 matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court must view the record
27 before it in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co.,*
28 *Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The moving party bears the burden of

establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).

   B.   Obviousness

A patent is presumed valid. *See* 35 U.S.C. § 282. Establishing invalidity requires clear and convincing evidence. *Moba B.V. v. Diamond Automation, Inc*., 325 F.3d 1306, 1319 (Fed. Cir. 2003). Under 35 U.S.C. § 103(a) "[a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." In *Graham v. John Deere Co.*, 383 U.S. 1 (1966), the Supreme Court set out the framework for applying § 103's statutory language:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Id.* at 17-18.

**II.   ANALYSIS**

   A.   The Prior Art

Following the framework in *Graham*, the court must determine the "scope and content of the prior art." *Id.* at 17. At the time Friskit filed its patent application in early 2000, computer users could listen to music from the internet by either downloading or streaming songs onto their computers. Streaming content—including music, video clips, and animation—need not be downloaded, though small parts of the file may be temporarily saved on a user's computer. Friskit's Summ. J. Mot. 2-3; '628 Patent col.1 l.33-35. All of the individual features of Friskit's patents which allow a user to easily search for and listen to

streaming media existed in the prior art.[1]  First, there were several media players capable of playing digital audio on home computers.  *See* Summ. J. Hr'g 55, Perlson Decl. Ex. L ("[W]e didn't invent . . . media players.").  Pre-existing media players included, among others, Winamp, *see* Tola Decl. ¶ 9;[2] Zellweger Expert Test. 104:8 ("Winamp was a media player."), and RealJukebox, *see* Zellweger Expert Test. 116-18.[3]  Some of these media players were integrated with web browsing software; for instance, the RealPlayer 4.0 plug-in software came bundled with Internet Explorer 4.0 and could be controlled from web pages through Java and other technologies.  Smith Decl. Ex. 5.[4]

Streaming media, including streaming audio, also existed prior to Friskit's patent.  *See* '648 Patent col.1 l.29-31 ("Computers currently can access streaming media on the Internet . . . includ[ing] for example, music, . . . .").  At least some of the existing media players, such as Winamp, possessed the ability to use a playlist consisting of a list of songs to be played back continuously and in order.  Zellweger Expert Test. 107:6-7; DeRose Decl. ¶ 20.  Further, these playlists could include streaming media.  Zellweger Expert Test. 107:6-7; DeRose Decl. ¶ 20.

Also prior to Friskit's patent, a number of web sites allowed users to locate media to download or stream.  Examples include mp3.com, *see* Zellweger Expert Test. 100:6 ("Mp3.com is a website that is a music directory where a user can search for music . . . ."), and IUMA.com, *see* Patterson Decl. ¶¶ 9-21.  On the mp3.com web site, users could construct a playlist of music and send it to a media player to be played back, via streaming, on the user's computer.  DeRose Decl. ¶ 20.  Further, it is undisputed that these web sites could be accessed from within Winamp, which contained an integrated "minibrowser" which could be used to browse the web,

---

[1] In its Motion for Summary Judgment on Infringement, Friskit listed the following among the "existing technologies" which it "glued" into a single application: "Media Players", "Search Engines," "Streaming Media," "Playlists," and "Internet Radios."  Friskit's Summ. J. Mot. 2.  Each of these technologies will be addressed below.

[2] Both parties filed evidentiary objections to several of the opposing party's declarations. Having reviewed the objections, the Court has found them immaterial or without merit.

[3] Polle T. Zellweger appeared as Friskit's expert witness.

[4] Julius Smith appeared as Real's expert witness.

allowing the user to perform searches on sites including mp3.com and IUMA.com and use mp3.com custom playlists.

Finally, programmatic control of the user's computer by a network server module existed in several forms prior to the filing dates on Friskit's patents. Technologies such as Java applets and JavaScript already allowed web sites and their corresponding servers to send programmatic instructions to the user's computer to be executed by the client web browser. Friskit's patents describe embodiments that utilize JavaScript to control the client computer: "For example, the network server module may includes [sic] applets or Java script [sic] delivered to the user terminal for execution of processes and functions as disclosed herein." '467 Patent col.11 l.14-17; '628 Patent col.11 l.21-24. In a similar fashion, IUMA.com's "Radio IUMA" service utilized JavaScript code sent from IUMA.com to the user's web browser in order to control an embedded RealPlayer plug-in. Patterson Decl. ¶ 22-24.

B.    The Level of Ordinary Skill in the Pertinent Art

The level of ordinary skill in the art is not in dispute. As stated by Friskit's expert, "a person of ordinary skill in the art of computer science would, through education, practical experience, or a combination of both, have the approximate equivalent of an undergraduate degree in computer science plus experience working in the field." Zellweger Decl. ¶ 11.

C.    Differences Between the Prior Art and the Claims at Issue

Two principles from the Supreme Court's recent opinion in *KSR Int'l Co. v. Teleflex Inc.* guide the analysis of whether sufficient difference exists between the prior art and Friskit's claims to render the patents nonobvious. First, "[w]hen a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007) (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976)). Second, "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the

1 anticipated success, it is likely the product . . . of ordinary skill and common sense." *Id.* at
2 1742.

### 1. Integration of prior art elements

Friskit's patents attempt to solve the "tedious" user experience of searching for and playing back media. Friskit's Summ. J. Mot. 1. The prior art, argues Friskit, required users to browse media sites for songs and once found, the desired song link might not contain the right song. '467 Patent col.1 l.26-31 (similar statements are found in all the patents at issue). The solution to this problem was integrating multiple elements, such as a media search engine and a media player, to create a seamless user experience. In other words, when a user searched for a song, the technology would return the song, automatically load it into the player, and then playback either one song or multiple songs. Eyal Dep. 88:12-16, Perlson Decl. Ex. M ("I believe that we developed several innovations . . . including . . . on a conceptual level, a combination of search capabilities and media playback capabilities."); Zellweger Dep. 42:25-43:3, De Gyarfus Decl. Ex. 18 ("The user no longer has to concern themselves with these issues [configuring a user's computer for search and playback] . . . because the system was integrated, . . . the media player and the searching and so on were in the same application . . . ."). The technology allowed a consumer to "conveniently find, organize, and playback streaming media over a network . . . in an integrated platform." Friskit's Summ. J. Mot. 1.

The idea of integrating these different components was not novel. Websites such as mp3.com already required the consumer to use them in conjunction with a media player. DeRose Decl. Ex. 5 RN 17728. And by the patents' priority date, January 24, 2000, media player and online music companies had begun to co-brand their products. Perlson Decl. Ex. O (On March 24, 1999, Tunes.com and Nullsoft, maker of Winamp, "announced the seamless integration of RollingStone.com content [including profiles of artists, music videos, and song clips] with the newest release of the Winamp player."); Perlson Decl. Ex. N (announcing in a November 2, 1998, press release that Winamp and mp3.com would partner to release a co-branded player.). Here, the solution to the problem of tedious user experience—integration—was well known and had already been utilized by others. And

Friskit's achievement of a seamless user experience was the anticipated or predictable result of its integration of different pre-existing elements.

### 2. Functionality of the integrated product

Nor was the functionality of the Friskit player novel or unpredictable. The Friskit player allowed a user to search for and play back streaming media, something which Friskit's own videos demonstrate had been done in the prior art. *See* Tola Decl. Ex. G. In its opposition to summary judgment, Friskit argues that its technology was a vast improvement over the prior art because, if used incorrectly or misconfigured, the prior art would not work seamlessly. But this proves little. If used in the normal course, the prior art allowed a user to open Winamp and search for music within the minibrowser on a music site (e.g., mp3.com, IUMA.com), click on one of the results to load it into the Winamp playlist, and have Winamp play multiple songs. While Friskit claims its invention made interruptions in the user experience less likely, this is simply the predictable result of integration. These benefits of integration had already been demonstrated in the prior art. When properly configured, the result of having a minibrowser in Winamp was that IUMA.com search results played back easily and without interruption. Loomis Decl. Ex. 2, winamp-mp3-dot-com-adam-pfeffer.avi. The concept of integrating these different components and the results achieved were well known in the prior art. Thus, Friskit's claims will survive an invalidity analysis only if they disclose that in arriving at an integrated media playback system, the Friskit technology did not use the known elements according to their established functions.

### 3. The claims

#### a. Programmatic control by the network server module ('467 Patent, claims 35 and 52; '628 Patent, claim 12)

Friskit argues that as described in the '467 Patent, claims 35 and 52 and the '628 Patent, claim 12, the network server module is not used according to its established function. Under these claims, the network server module "programmatically controls" the media player to playback media from the web. According to Friskit's expert, this control entails the network server module sending both "instructions" and "data" to the media playback component. Zellweger Decl. ¶ 27. Data, in this case constituting a list specifying the location of songs, was

-7-

sent by IUMA.com and mp3.com. Zellweger Decl. ¶ 28. As for instructions, Dr. Zellweger described how they were created and sent: "[T]he network server module creates a command, like a small program, and sends that over to the client side, and on the user interface when the user clicks 'Add All' or 'Play All' that command is then run." Zellweger Decl. ¶ 29.

In the prior art, instructions, in the form of JavaScript, were sent by the network to the client. *See* Patterson Decl. ¶ 24. IUMA Radio provides an example of JavaScript being used in the relevant prior art to control playback of media. Patterson Decl. ¶¶ 22-24. If a user went to IUMA.com and selected a genre of music, a RealPlayer module would open in the browser. Patterson Decl. ¶¶ 22-23. Then, using JavaScript embedded in the HTML, IUMA.com controlled RealPlayer through the web browser to playback music. Patterson Decl. ¶¶ 23-24. Friskit stated in the "Detailed Description" sections of the '467 and '628 Patents that its system could use JavaScript as a way that network-side code (i.e. commands created by the network server module) would be delivered and executed on the user's computer. '467 Patent, col.11 l.14-17; '628 Patent, col.11 l.21-24. As these references show, not only did network-side control, as defined by Dr. Zellweger, exist in the relevant prior art, but Friskit's patents also disclose that it knew about JavaScript and used it to do what had long been done in the prior art.

The above three claims also require that the programmatic control of the media player by the network server module cause the playlist to be played back in the designated order. In other words, the "instructions" and "data" sent by the network server module cause the songs to be played back in the order in which they were designated to play. Friskit argues Real's videos only show sequential playback by happenstance, and that their product removed this random chance and guaranteed media played back sequentially. Friskit does not argue, however, that sequential playback could not be achieved if the prior art was used properly. When properly configured, Winamp and its minibrowser, in conjunction with a music site, would playback streaming media sequentially. Loomis Decl. Ex. 2, winamp-iuma-copy-paste-to-playlist.avi and winamp-mp3-dot-com-adam-pfeffer.avi. Further, if a pre-made playlist was downloaded from a web site, *see* DeRose Decl. ¶ 20, or if a playlist was made of already-downloaded songs, Winamp would play the list back sequentially. At oral argument, Friskit stated that when

playing downloaded music, a user-created playlist would play not in the order designated but in the order the songs finished downloading. Summ. J. Hr'g 36, July 10, 2007. While this may be true when downloading multiple songs simultaneously, streaming media did not have this problem because the songs were not downloaded to the user's computer. *See* Friskit Summ. J. Mot. 2. With the prior art, a media player could achieve sequential playback of streaming media both with a user-created playlist and with a premade playlist. Loomis Decl. Ex. 2, winamp-mp3-dot-com-adam-pfeffer.avi and winamp-iuma-bees-capture-to-disk.avi.

    b.  Direct control by the search module ('275 Patent, claims 6 and 16)

The '275 Patent has three claims in issue. According to Friskit, the first two, claims 6 and 16, have a limitation similar to the '467 Patent claim 35 in that the media player is controllable by a separate module, here the search module. Dr. Zellweger's May 24, 2006, expert testimony on infringement states that the media player in RealPlayer 10 is controlled directly by the search module because a user can drag search results from the Music Store to the playlist. Zellweger Test. on Infringement ¶ 124. As demonstrated by Real, users of Winamp and IUMA.com could click on individual search results in the Winamp minibrowser to add them to the Winamp playlist. Loomis Decl. Ex. 2, winamp-mp3-dot-com-adam-pfeffer.avi. Thus, if Friskit's patent differs from the prior art, it is only because in the prior art the search module and media player are provided by separate entities rather than the same one. As discussed above, this is simply a predictable results of integration, and so is obvious. Finally, to the extent that Friskit's claims describe a search module which adds links to the playlist remotely from the server, the above analysis regarding "programmatic control" likewise renders such a claim obvious. In either case, these claims are invalid for obviousness.

    c.  Control of playback by the media player ('275 Patent, claim 38)

Claim 38 of the '275 Patent describes a media playback system "wherein the media player controls playback of the at least some of the media resources to be substantially automatic and sequential." Friskit argues that some of the evidence presented by Real of sequential playback was the result of happenstance. Friskit's Opp'n to Summ. J. Mot. 20.

However, the argument applies only when each song is downloaded and added to the playlist individually; it does not address the situation in which a user clicked on a link to a pre-made playlist, which would allow the media player to "play all of the songs in the playlist continuously and sequentially" in a manner free of happenstance. DeRose Decl. ¶ 20; Loomis Decl. Ex. 2, winamp-iuma-bees-capture-to-disk.avi. Since in the prior art the media player was the only module in use once the playlist had been loaded, it was controlling playback to be sequential, and therefore this limitation was found in the prior art.

Each of Friskit's claims achieved sequential playback by choosing one of three options—the network server module, the search module, or the media player module—to control the client in ways analogous to the prior art. As stated by the Court in *KSR*, when there are a finite number of "identified, predictable solutions" a person of ordinary skill in the art will have reason to pursue these options. *KSR*, 127 S. Ct. at 1742. And "[i]f this leads to the anticipated success, it is likely the product . . . of ordinary skill and common sense. *Id.* Because each claim achieves an anticipated success by merely selecting a different, previously identified solution for controlling playback, those claims are obvious.[5]

d. Streaming media and priority order ('648 Patent, claims 49 and 52)

In reference to the '648 Patent claim 49 (dependent on claim 37), Friskit argues that some of Real's evidence, specifically one video of Winamp, fails to demonstrate that the prior art allowed a user to play streaming media. Friskit does not deny, however, that streaming media existed in the prior art, or that Real's other exhibits (as well as one of Friskit's) do demonstrate streaming. In fact, Friskit's previous motion for summary judgment included a chart, entitled "Friskit's patents deliver the **glue** to put existing technologies together into a single application," which had streaming media as one of the existing technologies. And Friskit does not assert its technology uses streaming media in a novel way. Further, contrary to

---

[5]The Court notes that some of Friskit's claims select solutions from the prior art (media player control) while others select known, but potentially unused solutions (search module and network server module control). However, when each claim is taken individually, it chooses only one of the "identified, predictable solutions." *See Jones v. Hardy*, 727 F.2d 1524, 1528 (Fed. Cir. 1984) ("[E]ach claim must be considered as defining a separate invention.")

-10-

1 Friskit's assertions, Real does provide video evidence of Winamp, in conjunction with
2 IUMA.com, playing streaming media. *See, e.g.*, Loomis Decl. Ex. 2,
3 winamp-iuma-copy-paste-to-playlist.avi. The streaming media limitation does not render this
4 claim nonobvious.

5 Claim 52 of the '648 Patent, in addition to having the streaming media limitation,
6 requires that the media resources be arranged for playback in priority order. Friskit argues Real
7 has not demonstrated this limitation in the prior art because in one of Real's videos the media
8 resources are played back out of order. This argument fails for the same reasons Friskit's
9 argument on sequential playback was unavailing. Streaming media search results, when played
10 back through Winamp, would follow the order in which they had been returned by mp3.com.
11 Loomis Decl. Ex. 2, winamp-mp3-dot-com-adam-pfeffer.avi. Additionally, streaming media
12 playlists were put in predesignated order and then were played back by the user's media player
13 in that order. Loomis Decl. Ex. 2, winamp-iuma-bees-capture-to-disk.avi.

14 e. A single module with a user interface ('628 Patent, claim 12)

15 Friskit also argues that Winamp, with its integrated minibrowser, does not meet the
16 limitation of a "client module . . . to (I) provide . . . a first interface to receive a search request;
17 and (ii) control a media player" as described in claim 12 of the '628 Patent. Specifically, it
18 argues that the minibrowser does not control playback of the media. Friskit's Opp'n to Summ.
19 J. Mot. 21. However, the claim's plain language does not demand this. It requires only that the
20 "client module" (defined as "[a] module that is installed and executed on a user-terminal,"
21 Claim Constr. Order 2) (I) have a search interface and (ii) control a media player. The search
22 interface need not be the same interface that controls the media player. Winamp is a client
23 module which contains both an interface for searching (the minibrowser) and the ability to
24 control the media player (playback controls). Therefore, the limitations of this claim were
25 present in the prior art.

26 Friskit's invention took elements both known in the prior art and known to work in
27 conjunction with each other, and with these elements displaying no new functionality,
28 integrated them to produce a result which was predictable to one with ordinary skill in the art: a

-11-

more seamless user experience.  Where, as here, the patents yield a predictable result by arranging old elements with each performing its known function, the patents are invalid as obvious under § 103.  *See KSR.*, 127 S. Ct. at 1740.

### D. Secondary Considerations

The final element of the *Graham* test for obviousness requires ascertaining the extent of any objective indicia of nonobviousness.  These so-called secondary considerations include commercial success, long-felt need, failure of others, skepticism and unexpected results.  In some cases, such evidence can be the most probative of obviousness.  Secondary considerations, however, do not control the obviousness inquiry.  In other words, secondary considerations are but part of the totality of the evidence that is used to reach the ultimate conclusion of obviousness.  *Teleflex Inc. v. KSR Int'l Co.* 298 F. Supp. 2d 581, 595 (E.D. Mich. 2003), aff'd 127 S. Ct. 1727 (2007) (citations omitted);  *See also Leapfrog Enters., Inc. v. Fisher-Price Inc.*,  485 F.3d 1157, 1162 (Fed. Cir. 2007) (holding that given the strength of the prima facie obviousness showing, the substantial evidence of commercial success, praise and long-felt need was inadequate to overcome a final conclusion of obviousness).

Because Friskit's invention has never reached the market, there are no sales to evidence its commercial success.  Instead, Friskit argues that the substantial sales of Real's allegedly infringing player RealPlayer Plus and Rhapsody, establish commercial success as well as an unexpected result.  Friskit's Opp'n to Summ. J. Mot. 24-25, 27.  However, "[commercial] success is relevant in the obviousness context only if there is proof that the sales were a direct result of the unique characteristics of the claimed invention—as opposed to other economic and commercial factors unrelated to the quality of the patented subject matter." *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996).  In other words, the party asserting commercial success must prove a nexus between the commercial success and the claimed invention.  *KSR*, 298 F. Supp. 2d at 595.  Friskit offers only what it describes as a "prima facie case of infringement" as evidence of nexus.

Friskit argues that long felt need and failure of others and the teaching away from the Friskit solution create genuine issues of material fact regarding obviousness.  It asserts that

1  prior companies designed media players that worked with files available on a variety of network
2  servers and network servers that worked with a variety of media players.  Friskit chose a
3  different design path, having the network server control the media player to give the user an
4  improved experience.  Friskit's Opp'n to Summ. J. Mot. 26-27.  But it offers no facts
5  demonstrating a long felt need, failure of others or teaching away from its design choice.

6  Finally Friskit contends that Real's copying of Friskit's technology supports a finding of
7  nonobviousness.  In a declaration, George Aposporos, Friskit's chief executive officer,
8  described two meetings with Real personnel to explore possible technical cooperation.  Friskit's
9  representatives made power point presentations of Friskit's technology.  The thrust of the
10  presentation and discussion as related in the declaration appears to have been to demonstrate the
11  superiority of the Friskit technology.  Aposporos Dec. ¶¶ 12-16, Doc. 114.  Copying by a
12  competitor may be a relevant factor in the secondary factor analysis.  *Versa Corp. v. AG-BAG*
13  *Intern. Ltd.*, 392 F.3d 1325, 1325 (Fed. Cir. 2004).  But "copying requires the replication of a
14  specific product." *Id.*  The mere assertion of infringement does not establish the nonobviousness
15  of a patent, and Friskit does not offer evidence of actual copying of its claimed invention.

16  The court concludes that the evidence of secondary considerations is insufficient to
17  overcome Real's clear and convincing evidence of obviousness.  Defendants' motion for
18  summary judgment of invalidity under 35 U.S.C. § 103 is granted and the action is dismissed.

20  IT IS SO ORDERED.

23  DATED:  7/26/07                        _____
24                                          WILLIAM W SCHWARZER
                                            Senior United States District Judge